No. 99,232

STATE OF KANSAS, *Appellee*, v. SAUL ARTHUR MILLER,
*Appellant*.

(264 P.3d 461)

Opinion filed October 28, 2011.

*Shawn E. Minihan*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Ellen H. Mitchell*, county attorney, argued the cause, and *Steve Six*, attorney general, was with her on the briefs for appellee.

The opinion of the court was delivered by

LUCKERT, J.: This appeal follows the second trial of Saul Arthur Miller, who was convicted of rape, aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child. Miller's first trial ended in a mistrial when the State repeatedly violated the trial court's pretrial order limiting admission of the victim's statement. That mistrial becomes important in this appeal because Miller alleges the retrial violated his right to be protected from double jeopardy. Miller also argues the prosecutor committed misconduct, the trial court erred in disqualifying the child victim as a witness, the trial court erred in admitting evidence of statements made by the child victim to a sexual assault nurse examiner (SANE) in violation of his right to confront witnesses, the trial court's errors accumulated to deny him a fair trial, and the trial court committed sentencing errors.

The Court of Appeals affirmed Miller's convictions and sentences. *State v. Miller*, 42 Kan. App. 2d 12, 208 P.3d 774 (2009). Miller filed a petition for review, which this court granted as to all issues. Our jurisdiction arises from K.S.A. 22-3602(e) (petition for review) and K.S.A. 20-3018(b) (same). On review, we reject all of Miller's arguments and affirm his convictions and sentences.

## FACTS AND PROCEDURAL BACKGROUND

Thirty-year-old Miller was a close friend of the victim's family. He visited the family often, occasionally spending the night at their home. The victim's mother testified she never had any concerns about Miller playing with her 4-year-old daughter, N.A., who was the alleged victim. In fact, N.A. called Miller "Uncle Saul."

On July 19, 2005, Miller stopped by the victim's home in the early evening. The entire family was at home that evening—N.A.; N.A.'s mother and the mother's fiancé; N.A.'s grandmother, who lived with the family; and N.A.'s brother. N.A. spent most of the evening watching movies in the living room with Miller, who ended up spending the night at the family's home. Miller slept on a loveseat in the living room, while N.A. slept on the living room couch.

The other members of the family slept in their bedrooms, except for N.A.'s grandmother, who left around 9:30 p.m. for work.

According to N.A.'s mother, Miller left the home "quickly" after waking the next morning. That evening, N.A.'s mother asked if N.A. wanted "Uncle Saul" to spend another weekend at the house watching movies. N.A. said "No." When her mother asked why not, N.A. stated Miller had "hurt her." N.A. pointed to her vaginal area and told her mother that Miller had "touched her with his thingy and his fingers." N.A. also stated Miller held her arms down and her mouth shut during the attack. When asked why she did not tell her mother about the incident sooner, N.A. explained that Miller told her not to tell her parents. Upon N.A.'s complaint of vaginal pain, N.A.'s mother and grandmother examined N.A. and discovered that N.A.'s vagina was very red and irritated.

N.A.'s mother contacted law enforcement and N.A. was taken to the hospital emergency room, where she was examined by a SANE. The examination revealed several tears and abrasions on N.A.'s vagina and anus. The SANE did not observe any signs of handprints, bruising, discoloration, or scraping to N.A.'s arms or mouth.

Based on N.A.'s allegations, officers took Miller into custody on July 23, 2005, and Officer Shane Ashton interviewed Miller. According to Ashton, during the 1-hour interview Miller did not initially admit to any inappropriate touching of N.A. However, Miller eventually agreed to tell Ashton "what really happened between him and [N.A.]" in exchange for a cigarette. Ashton agreed, and Miller admitted to touching N.A.'s vagina with his hand, both on top of and underneath her underwear, and to inserting his finger into N.A.'s vagina. Miller did not admit to using his penis for penetration or to any anal penetration. Miller informed Ashton the incident occurred in the living room while N.A.'s mother was on a nearby computer and the mother's fiancé was upstairs.

Miller completed a written statement: "I touched her vagina with my finger throw [sic] her underwear[.] I might have touched her skin. I did put [it] on bear [sic] skin. I put finger in her not my penis."

The State charged Miller with rape, aggravated criminal sodomy, and two counts of aggravated indecent liberties with a child.

The State filed a pretrial motion requesting a hearing to determine whether, in the event N.A. was disqualified as a witness at trial, N.A.'s statements to her mother, her grandmother, and the SANE were admissible under the child-witness hearsay exception contained in K.S.A. 60-460(dd). The court held a hearing on the matter the day before the first trial. Miller argued that N.A.'s statements to all three women were testimonial and, therefore, the admission of this evidence would violate his confrontation rights. The State proffered the testimony of N.A.'s mother and grandmother, which the court found admissible because N.A.'s statements were nontestimonial.

In addressing whether N.A.'s statements to the SANE were testimonial, the State acknowledged the SANE would not be able to say "who did it . . . the name and identity." Nevertheless, the State questioned whether N.A.'s statements of "what happened" were testimonial. The prosecutor stated, "Saul Miller will not be, would not be mentioned, but [N.A.'s] statements, that [she] was touched with a thingy in this area, I believe those are admissible statements."

Upon inquiry from the trial court, the State explained the purpose of the SANE's examination was two-fold: (1) examination and treatment of injuries, and (2) testimony in court. The trial court ultimately ruled:

"The [SANE] . . . can testify as to what is medically relevant, . . . to the actual injuries observed. Because, as counsel has pointed out, this is a nurse and it is a medical treatment, a medical procedure. *Who is not relevant. When is not necessarily relevant. Where is certainly not relevant. But what was done is medically relevant to assess the injuries. Whether the what was accomplished by an object or a finger or a penis or something else is medically relevant, would be relevant to determining . . . the nature of the injury and the potential treatment for the injury. So, the what happened . . . can certainly be medically relevant.* The who, when . . . , and by implication the where is going to be excludable . . . . But the what happened, it would be, that would be a reasonable medical inquiry, regardless." (Emphasis added.)

Miller did not object to this ruling.

*Miller's First Trial*

The first trial began the next day. During opening statements, the prosecutor made the following statement that became relevant to the motion for mistrial: "N.A. told the nurse he put his thingy in her private, he put his finger in her butt, took it out, licked it, and the nurse, based on that information conducted an examination." In context, "he" referred to Miller.

The State called N.A., who was 6 years old at the time of trial, as its first witness. When the court attempted to give N.A. the children's oath, N.A. remained silent. When the State asked N.A. if she knew what it meant to tell the truth, N.A. shook her head in the negative. N.A. also remained silent when the State asked N.A. if she would answer a few questions. At that point, the State asked the court to determine whether N.A. would be permitted to testify due to her inability to answer the children's oath.

Citing K.S.A. 60-460(dd), the court determined N.A. was not available to testify because "she is either unwilling or unable to respond to even the most elementary questions, or to express any understanding of the necessity of testifying truthfully in this proceeding." In addition, as required by K.S.A. 60-460(dd), the court found N.A. was the alleged victim of the crime, N.A.'s statements to her mother, grandmother, and "to the extent limited yesterday" the SANE were reliable, and N.A. was not induced by threats or promises to make any false statements.

The State called as witnesses N.A.'s mother, N.A.'s grandmother, Officer Ashton, and the SANE. During the State's direct examination of the SANE, the prosecutor asked, "[Y]ou indicated that you took some brief information about the incident in order to know what to look for . . . in this case. Can you outline what [N.A.] told you?" The SANE responded, "[W]hen I asked her what happened she had said that she was, um, watching TV, with a man, and that he had held her arms tight, um——." Miller objected, and the trial court held a bench conference. The prosecutor stated, "I went over that with her, Judge. In fact, I went over, outlined here exactly what she could say; that was not part of it. I can have her step down and remind her again, but I did go over this, this yesterday and again today."

At this point, Miller moved for a mistrial due to a violation of his confrontation rights. The prosecutor asked the trial court to instruct the jury to disregard the statements, arguing the SANE's testimony was no different than the mother's testimony and Miller's confession (which had previously been admitted). The trial court denied the motion for mistrial but ordered the SANE's statement stricken and admonished the jury to disregard the statement.

Miller renewed his motion for mistrial during the prosecutor's closing argument when the prosecutor explained the aggravated criminal sodomy charge by stating, "[T]he State contends that the prohibited or illegal act was anal penetration, however slight, by any body part or object, and, again, [N.A.] told [the SANE] that the defendant stuck his finger in her butt, pulled it out and licked it." Defense counsel objected and moved for mistrial. As soon as the objection was made, the prosecutor stated, "I'm sorry." The trial court found:

"That is the third time that we violated the [order] in limine. . . . You said it in your opening statement also. Your witness said it from the witness stand . . . . Now, I don't think we can excuse a third one.

 . . . .

"THE COURT: I'm afraid we're going to have to go through this all again. A matter even to determine whether this is intentional under [*Oregon v. Kennedy*, 456 U.S. 667, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982)]."

The prosecutor responded, "Okay."

After a recess, the trial court made a statement as to why it was granting Miller's motion for mistrial and then the following colloquy occurred between the prosecutor and the trial court:

"[The State]: Judge, for the record . . . I honestly don't recall [a violation of the order in limine] happening in the opening statements, and—

"[THE COURT]: I have a specific note, I have a specific note, [defense counsel] stood up, he did not object at that point, but I have a specific note that you absolutely did say that during your opening statement, I think the record would—

"[The State]: I'm sorry, I didn't realize that, I wrote it out, I read from it, I didn't recall ever.

"[THE COURT]: Because I was frankly quite shocked when you said that. And I know [defense counsel], from his reaction, was also, and apparently, decided to let it go at that point.

"[The State]: The other thing at the opening statement [is that] she [N.A.] hadn't yet been disqualified as a witness. The other, I think what the nurse said

on the couch, I don't think [the SANE] identified the defendant either, but clearly I did say it in the closing, didn't do it purposely or intentionally, without thinking, I do apologize for that, I don't have a problem with retrying it."

Based on the trial court's indication the case would be set for a second trial, Miller filed a motion to dismiss on double jeopardy grounds under K.S.A. 22-3108(1)(c). Miller argued the cumulative violations of the order in limine resulted from an intent on the part of the prosecutor to goad him into moving for mistrial and it was impossible for him to receive a fair trial.

At the hearing on the motion, the prosecutor argued she did not violate the order in limine during opening argument:

"I did say that she [N.A.] told the nurse he put his thingy in her private, but I, and I did do that, I typed that out, and I had thought that through because I believed that did not identify the defendant. To say, I did not say the defendant, I did not say Saul Miller, what I was saying was the perpetrator, he put his thingy in her, and I happened to use some sort of a pronoun, I couldn't use she, if I misunderstood the Court's order then I misunderstood, but did not believe that way using a pronoun that I would, he, because shes [*sic*] don't have thingys, that I would be violating that order."

As to the SANE's testimony, the prosecutor argued the testimony—that N.A. had told her a man had held her arms tight—was not objectionable because the SANE was explaining why she looked for evidence of bruising on N.A.'s arms. Finally, the prosecutor conceded her closing argument clearly violated the court's order in limine but argued it was not intentional; the prosecutor stated, "I just got caught up." The prosecutor further stated, "I felt that the trial had gone as good as these cases can possibly be, these are difficult cases, this case was better than most of the sex offense cases we tried as far as evidence. I didn't think there were any problems." The prosecutor also candidly admitted she did not believe N.A. would be able to testify at trial.

In ruling, the trial court rejected, in part, the prosecutor's arguments, indicating the use of the pronoun "he" in the opening statement was "disingenuous" and other terms could have been used. The court found the SANE's testimony was a mistake on the SANE's part and her answer was not responsive to the prosecutor's question, but the statements in closing argument were a clear vi-

olation of the limine order. Nevertheless, the court determined the mistakes, while serious enough to taint the jury in the first trial, did not intentionally goad the defendant into a fork in the road where he either had to request a mistrial or proceed with inadmissible evidence. The court denied Miller's motion to dismiss and set the matter for retrial.

## Miller's Second Trial

The second trial was scheduled for a date approximately a month and a half after the conclusion of the first trial. At a pretrial hearing before the second trial, the trial court determined it would take judicial notice of its prior ruling that N.A. was unavailable as a witness.

At trial, N.A.'s mother testified N.A. told her Miller "touched her with his thingy and his fingers, through her vagina area and she pointed . . . [d]own to her vagina." N.A.'s mother also testified N.A. reported that Miller had held N.A.'s hands down and mouth shut during the act. N.A.'s mother further stated she never heard screams, muffled sounds, or anything inappropriate during the evening. N.A.'s grandmother testified N.A. told her Miller "touched . . . her private with his finger and penis."

The SANE testified N.A. told her that "a person had held her arms and at times put his hand on her mouth and that he had moved, she had on a shirt and underwear and that the person had moved her underwear aside and put his thingy on her private, that he had put his finger in her butt and took it out and licked it." The SANE confirmed that "thingy" is how N.A. referred to a penis. The SANE's examination revealed redness, lacerations, and abrasions around N.A.'s vagina and anus. The court admitted into evidence photographs the SANE took of N.A.'s injuries. The SANE testified the injuries were consistent with N.A.'s statement regarding what occurred during the assault.

The State also called Officer Ashton, who testified about Miller's confession. Miller took the stand and claimed he only confessed to the acts because Ashton promised him probation. Miller testified Ashton told him what to write in his confession.

The jury convicted Miller of all counts. The court sentenced Miller to a controlling term of 203 months' imprisonment. The court also ordered 36 months of postrelease supervision and denied Miller's motion for new trial and judgment of acquittal. ·

## DOUBLE JEOPARDY

In his first issue on appeal, Miller contends the trial court violated his constitutional right to be protected from double jeopardy by allowing the State to proceed to retrial after the prosecutor's misconduct caused the first trial to end in mistrial. Miller maintains the prosecutor repeatedly violated the trial court's pretrial order limiting the admissibility of N.A.'s statements to the SANE and, because of this misconduct, Miller was "faced with the worst possible Hobson's Choice: proceed with a trial knowing that the jury, his jury, was prejudiced against him, or ask for a mistrial and lose his chosen jury."

The State maintains there is no evidence the prosecutor intended to provoke the mistrial. The Court of Appeals agreed. *Miller*, 42 Kan. App. 2d at 19.

### *Prosecutorial Misconduct and Double Jeopardy*

The Double Jeopardy Clause of the Fifth Amendment to the United States Constitution protects a criminal defendant from multiple prosecutions for the same offense. *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S. Ct. 2083, 72 L. Ed. 2d 416 (1982). This court has previously recognized that the double jeopardy provision of the United States Constitution is equal in scope and protection to § 10 of the Kansas Constitution Bill of Rights. *State v. Morton*, 283 Kan. 464, 467, 153 P.3d 532 (2007). These constitutional guarantees against double jeopardy are codified at K.S.A. 21-3107 and K.S.A. 21-3108.

"The Double Jeopardy Clause of the Fifth Amendment protects a criminal defendant from repeated prosecutions for the same offense. [Citation omitted.] As a part of this protection against multiple prosecutions, the Double Jeopardy Clause affords a criminal defendant a 'valued right to have his trial completed by a particular tribunal.' " *Kennedy*, 456 U.S. at 671-72 (quoting *Wade v. Hunter*,

336 U.S. 684, 689, 69 S. Ct. 834, 93 L. Ed. 974 [1949]). However, there is no guarantee there will be only one proceeding. One circumstance where the guarantee may not apply is where the defendant requests a mistrial; in such a case, generally the State may retry the defendant. *Kennedy*, 456 U.S. at 672. Nevertheless, "even where the defendant moves for a mistrial, there is a narrow exception to the rule that the Double Jeopardy Clause is no bar to retrial." *Kennedy*, 456 U.S. at 673; see *State v. Muck*, 262 Kan. 459, 466-67, 939 P.2d 896 (1997). This is because, the United States Supreme Court explained, "there would be great difficulty in applying such a rule where the prosecutor's actions giving rise to the motion for mistrial were done 'in order to goad the [defendant] into requesting a mistrial.' [Citation omitted.]" *Kennedy*, 456 U.S. at 673. The Court defined the "circumstances which *will* allow a defendant to interpose the defense of double jeopardy to a second prosecution where the first has terminated on his own motion for a mistrial," *Kennedy*, 456 U.S. at 673-74, stating:

"Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion . . . does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to 'goad' the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion." *Kennedy*, 456 U.S. at 675-76.

This court has applied this limited *Kennedy* exception on several previous occasions. See *Morton*, 283 Kan. at 469-71; *State v. Williams*, 268 Kan. 1, 7, 988 P.2d 722 (1999); *Muck*, 262 Kan. at 467, 469-70; *State v. Cady*, 254 Kan. 393, 399-400, 867 P.2d 270 (1994); *cf. State v. McClanahan*, 259 Kan. 86, 102, 910 P.2d 193 (1996) (citing *Kennedy* for the proposition that "[i]n evaluating the misconduct . . . , the question remains whether the prosecutor's intentional attempt to introduce inadmissible evidence substantially prejudiced the defendant's right to a fair trial and required the defendant to ask for a mistrial").

*Morton* is particularly instructive in light of some similarities with this case. On direct appeal after the defendant's first trial, this court reversed Morton's convictions due to prosecutorial misconduct in

*State v. Morton,* 277 Kan. 575, 86 P.3d 535 (1994). On remand and retrial, Morton was again convicted; in his appeal, Morton argued the prosecutorial misconduct in the first trial barred his second trial under *Kennedy.* This court rejected Morton's claim, holding: *"Kennedy* requires something more than misconduct, even intentional and reversible misconduct, in order to bar retrial. It requires that the prosecutor intended to provoke a mistrial, to goad a defendant into sacrificing his or her choice to live with the outcome from the first jury." *Morton,* 283 Kan. at 471.

The *Morton* court found no support in the record for the defendant's position that the prosecutor committed deliberate misconduct in the first trial in order to provoke Morton to move for mistrial for the purpose of obtaining a new trial in which the State could introduce previously excluded testimony; the court noted there was "little motivation for [the prosecutor] to do so." *Morton,* 283 Kan. at 471; see also *Williams,* 268 Kan. at 6-7 (rejecting claim that alleged prosecutorial errors for which defense motions for mistrial were denied barred retrial because review of record did not indicate the errors were motivated by design to provoke defendant into moving for mistrial; "[i]ntentional prosecutorial misconduct motivated by a desire to obtain a conviction and not by a desire to provoke the defendant into moving for a mistrial may be grounds for a mistrial but it does not preclude retrial of the case"); *Cady,* 254 Kan. at 399 (although prosecutor was aware that juror's disparaging remark about defendant could be grounds for mistrial if brought to the court's attention and delayed informing the trial court of the remark, double jeopardy did not bar second trial because there was no evidence prosecutor influenced the juror, thus provoking defendant to request a mistrial).

Hence, the question we must resolve is not whether there was prosecutorial misconduct in the first trial, but whether the prosecutor intended to provoke a mistrial. The *Kennedy* decision instructs courts to "[i]nfer[] the existence or nonexistence of intent from objective facts and circumstances." *Kennedy,* 456 U.S. at 675.

*Standard of Review*

Applying these general principles, the trial court made the factual finding that the prosecutor's violations of the order in limine,

while necessitating a mistrial, were not intended to provoke Miller into seeking a mistrial. See *Kennedy*, 456 U.S. at 675 (determining whether intent of prosecutor was to goad defendant into moving for mistrial "calls for the court to make a finding of fact"); *State v. Thomas*, 275 Ga. 167, 167-68, 562 S.E.2d 501 (2002) (whether prosecutorial misconduct was intended to provoke a defendant's motion for mistrial is a factual question appropriately decided by the trial court); *State v. O'Connor*, 936 A.2d 216, 220 (R.I. 2007) (same). Generally, a trial court's factual findings are reviewed under the substantial competent evidence standard. *State v. Gonzalez*, 290 Kan. 747, 756-57, 234 P.3d 1 (2010). Ultimately, however, the question of "[w]hether a particular criminal defendant's protection against double jeopardy was violated is a question of law over which we have unlimited review." *Morton*, 283 Kan. at 468. As such, a layered standard of review applies: First, we determine whether the trial court's factual finding that the prosecutor did not intend to provoke a mistrial is supported by substantial competent evidence and, second, we conduct a de novo review of whether the trial court's findings support its conclusion of law.

*Analysis*

Applying this standard, we conclude there is substantial competent evidence to support the trial court's finding that the prosecutor did not provoke the mistrial. Granted, the prosecutor violated the order in limine during the opening statement by referring to "he" just as she had throughout the opening when referring to Miller. In context, the use of the pronoun was an accusatory statement implicating Miller. Yet, there is also reason to credit the prosecutor's insistence that she did not intentionally violate the order. The prosecutor mentioned she had this statement written out because she believed it was appropriate to use the pronoun "he" given that the pronoun "she" was clearly not appropriate. The prosecutor seemed at a loss as to why she had violated the order in limine during opening statements. The prosecutor's confusion could have arisen from an exchange with the trial court at the pretrial hearing in which the prosecutor had explained she was not asking to refer to the defendant by name but would explain what N.A. had stated

had happened. The court had responded, "I think absolutely that would be admissible." This vague exchange could have been interpreted to mean the court was merely prohibiting the use of Miller's name.

As to the second violation of the order, when the SANE referred to N.A.'s statement that she was watching TV with a man, the trial court reasonably rejected defense counsel's invitation to attribute the SANE's misstatement to the prosecutor. First, it is unclear whether referring to N.A. watching TV with a "man" was a violation of the order in limine. In declaring a mistrial, the trial court found the SANE testified that N.A. "told her that this defendant did it or that he did it." However, there is no such statement from the SANE. Moreover, even if the SANE's testimony violated the order, it does not appear the violation was directed by the prosecutor. In fact, the prosecutor repeatedly asserted that she had discussed the order in limine with the SANE to avoid such a violation.

There is no question, however, that the prosecutor's statement in closing argument—that N.A. "told [the SANE] that the *defendant* stuck his finger in her butt, pulled it out and licked it"—violated the trial court's order in limine. (Emphasis added.)

Nevertheless, a thorough review of the transcript from the first trial reveals no reason the prosecutor would have wanted to goad Miller into requesting a mistrial. Certainly, there would have been no motivation for doing so during opening statements; the prosecutor seemed satisfied with the trial court's pretrial rulings, and we cannot imagine a reason the prosecutor would have wanted to terminate the trial as early as opening statements. Likewise, there is no apparent reason for the prosecutor to have desired a mistrial during closing argument. The State's evidence against Miller was strong, and the prosecutor had effectively cross-examined Miller, calling into question his testimony that he confessed to a crime he did not commit because he was afraid of going to prison. Considering the unchallenged testimony of N.A.'s mother and grandmother, it seems unlikely that the prosecutor would have intentionally risked a mistrial.

In the end, while the mistrial was warranted, there simply is no evidence the prosecutor intended to provoke the mistrial. Substan-

tial competent evidence supports the trial court's finding that there was no such intent. The resolution of the question of law follows from this conclusion in light of the holdings in *Kennedy*, 456 U.S. at 672, and *Morton*, 283 Kan. at 471. As such, double jeopardy does not bar Miller's second trial and convictions.

## PROSECUTORIAL MISCONDUCT

Next, Miller contends the prosecutor committed misconduct on two occasions during the second trial: (1) during direct examination of the SANE and (2) during closing argument.

*Direct Examination*

During direct examination, the prosecutor asked the SANE what N.A. told the SANE about the incident. The SANE responded:

"She told me that a person had held her arms and at times put his hand on her mouth and that he had moved, she had on a shirt and underwear and that the person had moved her underwear aside and put his thingy on her privates, that he had put his finger in her butt and took it out and licked it."

Miller did not object to this testimony.

Miller now argues the prosecutor violated the trial court's order in limine by eliciting this testimony. The State counters that Miller failed to preserve this argument for appellate review. The Court of Appeals agreed with the State, concluding Miller's failure to object at trial to the SANE's testimony prevented appellate review of Miller's claim. *State v. Miller*, 42 Kan. App. 2d 12, 21, 208 P.3d 774 (2009).

Miller maintains no objection is required for an allegation of prosecutorial misconduct. However, this court has held that allegations of prosecutorial misconduct that arise as evidentiary claims, as opposed to misconduct occurring during opening or closing statement, require a contemporaneous evidentiary objection pursuant to K.S.A. 60-404 to be reviewable on appeal. See *State v. Inkelaar*, 293 Kan. 414, 264 P.3d 81 (2011); *State v. McCaslin*, 291 Kan. 697, 706, 245 P.3d 1030 (2011) (citing K.S.A. 60-404 and *State v. King*, 288 Kan. 333, 349, 204 P.3d 585 [2009]).

It should be noted that although the trial court granted Miller a continuing objection to "the *Crawford* questions with regard to the

witnesses," that standing objection does not preserve Miller's claim here. This is because Miller alleges the prosecutor violated the order in limine, which *partially granted* Miller's pretrial objection to the evidence and limited the nature of the testimony the State could elicit. On the other hand, the continuing objection preserved Miller's argument that the district court's order in limine *partially denied* Miller's objection by not excluding *all* of N.A.'s statements to the SANE under the holding in *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). In other words, the continuing objection did not act as a preemptive strike against any possible, future violations of the order to the extent it had been *granted*. See *State v. Crum*, 286 Kan. 145, 162, 184 P.3d 222 (2008) (When a motion in limine is granted to preclude the introduction of evidence, the party who obtained the favorable ruling must object to the evidence introduced in violation of the order in limine to preserve an issue on that ground for appeal.). Miller failed to preserve the issue of an alleged violation of the order in limine by not contemporaneously and specifically objecting.

Miller has not properly preserved for review this allegation of evidentiary prosecutorial misconduct.

*Closing Argument*

Because an objection is not required for alleged prosecutorial misconduct during opening and closing argument, we need not consider whether Miller's second claim of misconduct was preserved. Appellate review of an allegation of prosecutorial misconduct involving improper comments to the jury during closing argument requires a two-step analysis. First, the appellate court decides whether the remarks were outside the wide latitude that the prosecutor is allowed in discussing the evidence. Second, if misconduct is found, the appellate court must determine whether the improper remarks prejudiced the jury against the defendant and denied the defendant a fair trial. *State v. Adams*, 292 Kan. 60, 66-67, 253 P.3d 5 (2011); *State v. Huerta-Alvarez*, 291 Kan. 247, 261, 243 P.3d 326 (2010); *State v. McReynolds*, 288 Kan. 318, 323, 202 P.3d 658 (2009).

As to the first step, a prosecutor crosses the line of appropriate argument when a remark is intended to inflame the jury's passions or prejudices or when the remark diverts the jury's attention from its duty to decide the case on the evidence and controlling law. *Adams*, 292 Kan. at 67. However, in determining if the remark is within the wide latitude allowed a prosecutor during his or her argument, an appellate court may consider whether the prosecutor's remark is provoked or made in response to defense counsel's remarks. See *State v. Hunt*, 285 Kan. 855, 867, 176 P.3d 183 (2008); *State v. McKinney*, 272 Kan. 331, 347-48, 33 P.3d 234 (2001), *overruled on other grounds State v. Davis*, 283 Kan. 569, 158 P.3d 317 (2007).

As to Miller's specific argument, he suggests the prosecutor crossed the line of permissible comment when, during the State's rebuttal closing argument, the prosecutor stated, "Think how frightened four-year-old [N.A.] was that night, when an adult family friend begins to touch her." Miller contends the prosecutor "impugned Mr. Miller's argument—that his confession was not reliable because he was threatened." He maintains the remark was made only to improperly appeal to the jury's sense of compassion for the victim.

In response, the State argues the prosecutor's remark was not a request for the jury to feel sympathy for N.A. Rather, the remark was an appropriate response to Miller's closing argument, which questioned how N.A.'s mother did not see or hear anything if the attack occurred in the living room when she was nearby on the computer. The State maintains it was "asking the jury to understand why a four year old might be too frightened to yell out during an attack and too frightened to immediately report."

Placing the remark in context confirms the State's position. The prosecutor argued:

"Ladies and gentlemen, the Defense argues, and the defendant told you that the defendant supposedly went back to Sunset Billards after this incident had happened and supposedly was scared by a couple of guys who are unnamed, unreported, who supposedly threatened him in the bar for this incident. Think how frightened four-year-old [N.A.] was that night, when an adult family friend begins to touch her. Is it too much to believe that she was so terrified that she

didn't cry out, or that she didn't do anything, and that she didn't run? Is it so hard to believe that maybe she didn't even understand what was happening to her? . . . And is it so hard to believe that she didn't do anything about it until the defendant left the house, and she didn't tell until mom suggests, 'Hey, should we have Uncle Saul come back again and watch some movies?' and at that point she says no, mom says, 'Why not?' [and she says] 'He hurt me.' And then she goes on to tell her mother what had happened? Is it so outrageous and unbelievable to think that she was terrified, and not sure what to do?"

Considering the context, the Court of Appeals panel concluded the prosecutor's remarks were within the wide latitude afforded a prosecutor in discussing the evidence. The panel noted the remarks were also in response to Miller's closing argument that N.A.'s house was " 'not a house in which this young lady was supposedly secreted out into a place where no one can see, hear, understand, view, what was going on.' " *Miller*, 42 Kan. App. 2d at 21. Finally, the panel pointed to Miller's closing argument that no police officer took the time " 'to go into that house, to measure, to look [and] . . . ask the hard question, "Well, ma'am [N.A.'s mother], you're fifteen, eighteen feet away, you didn't hear her squirm? She's being sexually violated and you're eighteen feet away? And you didn't hear something?" ' " *Miller*, 42 Kan. App. 2d at 21.

We agree with the Court of Appeals' conclusions that the prosecutor's remarks were an appropriate response to defense counsel's arguments and were not inappropriate in the context in which they were made. As such, no prosecutorial misconduct occurred, and we need not address the second step of the prosecutorial misconduct analysis.

### DISQUALIFICATION OF N.A.

Next, Miller contends the trial court erred in admitting N.A.'s hearsay statements. The basis for his argument is that the trial court's "investigation into N.A.'s disqualification was simply not a thorough enough investigation in determining whether N.A. was disqualified." In the alternative, Miller contends the trial court erred in not attempting to elicit testimony from N.A. via closed-circuit television. See K.S.A. 22-3434.

The State maintains the trial court made the necessary findings under K.S.A. 60-460(dd) (actions involving children) and the jury

was given a limiting instruction that complied with the statute. The State also asserts Miller's argument regarding closed-circuit television ignores the facts that N.A. did not understand or agree to the children's oath and N.A. was not willing to answer any questions.

Miller alleges he opposed the trial court's finding that N.A. was unavailable as a witness at the first trial and then cites his continuing objection at the second trial. However, Miller did not properly preserve this issue for review.

At the hearing prior to the first trial on the State's motion to determine the admissibility of N.A.'s statements to her mother, grandmother, and the SANE, Miller argued the admission of the hearsay statements would violate his confrontation rights and proposed having N.A. testify via closed-circuit television pursuant to K.S.A. 22-3434 as a way to "get around" the confrontation problem. The court found this proposal premature given N.A. had not yet been disqualified and elected to delay until trial its determination on whether N.A. was unavailable as a witness.

At the first trial, after the trial court found N.A. unavailable as a witness, defense counsel asked the trial court to "reconsider" and then renewed Miller's confrontation argument. The trial court responded, "Actually, this is not, in the Court's opinion, . . . a *Crawford* analysis based on the Court's ruling yesterday." The trial court then made the necessary findings under K.S.A. 60-460(dd) for the admission of N.A.'s hearsay statements to her mother, grandmother, and the SANE—limited by the court's order in limine—and granted Miller a continuing objection to the testimony of N.A.'s mother, grandmother, and the SANE.

Following the mistrial, approximately 1 month later, the trial court held a pretrial conference where Miller asked the court to "continue those prior orders" to "preserve the issues regarding the testimony [*sic*] or the non-testimonial issues the Court has previously ruled upon" and noted the defense would be seeking at the retrial the same standing objection "that the Court had granted [Miller] in the other case." Defense counsel inquired as to whether the trial court wanted to address the prosecutor's opinion that N.A. would not testify at the second trial. The trial court then deter-

mined, "I think we all observed the child before . . . and I think the Court can take judicial notice of that ruling and I don't think we need to bring the child in at this point like we did the last time and have her do nothing."

Defense counsel responded:

"And, Your Honor, I understand that, I would, expecting [*sic*] the same response unless there's some information from the State. But in speaking with [the prosecutor], she is very clear to me that she does not expect any changes in that area. I don't see it's going to serve any purpose to have [N.A.] come in, sworn in, and not state anything, that the Court wants to make that ruling at this time."

The trial court responded, "Right."

The standing objection the trial court granted Miller at the second trial, upon which Miller relies as his objection, was expressly with regard to the "*Crawford* questions." Nowhere in this colloquy between defense counsel and the trial court is there an objection on Miller's part to the trial court's decision that N.A. was not qualified as a witness or an objection to the trial court's grounds for her disqualification. Even if Miller's argument on confrontation grounds at the first trial is liberally construed as an objection to the trial court's ruling regarding N.A.'s disqualification, Miller's consent to N.A.'s disqualification as a witness at the second trial waived any objection. Further, the fact Miller requested the court's use of a closed-circuit television at the first trial does not preserve this request for the second trial. " '[W]hen a new trial is granted on the motion of the defendant in a criminal prosecution, the granting of the same places the party accused in the same position as if no trial had been had.' [Citations omitted.]" *State v. Morton*, 283 Kan. 464, 468, 153 P.3d 532 (2007).

As such, Miller has failed to preserve his present challenge for appellate review by both failing to raise a contemporaneous objection to the trial court's ruling and by, at the preliminary hearing before the retrial, inviting the trial court into the error he now challenges on appeal. See *State v. Divine*, 291 Kan. 738, 742, 246 P.3d 692 (2011) (a party may not invite error and then complain of that error on appeal); *McCaslin*, 291 Kan. at 705-06 (contemporaneous objection required under K.S.A. 60-404 to raise trial error on appeal).

## CONFRONTATION RIGHTS

Miller next argues the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution when it admitted N.A.'s statements to the SANE into evidence at trial without giving him an opportunity to cross-examine N.A. regarding those statements. The State maintains the statements were nontestimonial and were properly admitted under *Crawford*, 541 U.S. 36.

*Standard of Review*

Miller's arguments are subject to a de novo standard of review because he challenges the legal basis of the trial court's admission of evidence, specifically that the evidence was admitted in violation of the Confrontation Clause of the Sixth Amendment to the United States Constitution. See *State v. Dukes*, 290 Kan. 485, 487, 231 P.3d 558 (2010) (de novo standard applies to review of legal basis of admission of evidence); *State v. Appleby*, 289 Kan. 1017, 1054-55, 221 P.3d 525 (2009) (same); *State v. Henderson*, 284 Kan. 267, 276, 160 P.3d 776 (2007) (de novo standard applies to determination of whether the right of confrontation has been violated).

*Challenged Statements*

Miller identifies two lines of the SANE's testimony he claims to be testimonial. The first relates to the SANE's testimony regarding N.A.'s description and naming of different body parts, *i.e.*, "privates" and "thingy" for a penis and "privates" for a female. The SANE explained she attempts to learn the terms a child uses when referring to various body parts. To learn N.A.'s terminology, the SANE showed N.A. two anatomical drawings found in the KBI sexual assault evidence kit, one for a preschool female and one for an adult male. The SANE then labeled the diagrams with the words that N.A. used. The State offered these diagrams as exhibits before the SANE testified to N.A.'s terminology, and defense counsel responded, "No objection, Your Honor." The failure to object waives any argument regarding error in the admissibility of evidence of the terms N.A. used to describe body parts. See *Divine*, 291 Kan.

at 742 (defendant may not invite error and then complain of the error on appeal).

The second line of testimony at issue on appeal consisted of the following exchange:

"[Prosecutor]: Did you ask her to tell you what happened to her?

"[SANE]: Yes, I did.

. . . .

"[Prosecutor]: What did she tell you happened?"

"[SANE]: She told me that a person had held her arms and at times put his hand on her mouth and that he had moved, she had on a shirt and underwear and that the person had moved her underwear aside and put his thingy on her privates, that he had put his finger in her butt and took it out and licked it."

Miller did not contemporaneously object to this testimony. Nonetheless, as was noted above, at the outset of the trial, the trial court granted Miller a continuing objection to the *"Crawford* questions."

*General Legal Principles*

Similar, *Crawford*-related arguments are also addressed in *State v. Bennington*, 293 Kan. 503, 264 P.3d 440 (2011). Consequently, we include our discussion of the general legal principles in both opinions. These principles begin with the substance of the Confrontation Clause, which provides: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. That guarantee applies to criminal defendants in both federal and state prosecutions. See *Pointer v. Texas*, 380 U.S. 400, 406, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (1965) (Sixth Amendment applicable to states through the Fourteenth Amendment). Similarly, a criminal defendant in Kansas has the right to "meet the witnesses face to face." Kan. Const. Bill of Rights, § 10.

In a landmark decision, *Crawford*, 541 U.S. 36, the United States Supreme Court significantly revised the rules related to an analysis of whether the admission of hearsay statements violates the Confrontation Clause. Specifically, *Crawford* held a witness' testimonial statements against a defendant are inadmissible unless the witness appears at trial or, if the witness is unavailable to testify

at trial, the defendant had a prior opportunity for cross-examination. If the statements are nontestimonial, the Confrontation Clause guarantees are not implicated. *Crawford*, 541 U.S. at 68; see *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309, 129 S. Ct. 2527, 174 L. Ed. 2d 314 (2009); *Appleby*, 289 Kan. at 1055; *State v. Brown*, 285 Kan. 261, 285, 173 P.3d 612 (2007); *State v. Davis*, 283 Kan. 569, 575, 158 P.3d 317 (2007). Consequently, post-*Crawford*, the threshold question in any Confrontation Clause analysis is whether the hearsay statement at issue is testimonial in nature. *Appleby*, 289 Kan. at 1055; *Brown*, 285 Kan. at 285.

In this appeal, the parties do not dispute that the challenged statements are hearsay, N.A. was unavailable at trial, and Miller did not have an opportunity to cross-examine N.A. regarding the statements she made to the SANE. Nor do they dispute that there are hearsay exceptions that apply to this case, including K.S.A. 60-460(dd). Other hearsay exceptions that are implicated include K.S.A. 60-460(l)(2) (hearsay exception permitting admission of declarant's statement of "previous symptoms, pain or physical sensation, made to a physician consulted for treatment or for diagnosis with a view to treatment, and relevant to an issue of declarant's bodily condition") and K.S.A. 60-460(m) (hearsay exception permitting admission of writings offered as memoranda or record of acts made in regular course of business). Nevertheless, the fact the evidence may be admissible under a hearsay exception does not cure the confrontation problem if N.A.'s statements made to the SANE are found to be testimonial. *Crawford*, 541 U.S. at 59; see *State v. Noah*, 284 Kan. 608, 622, 162 P.3d 799 (2007) (Davis, J., concurring) ("If a court determines that these other statements are testimonial hearsay, the statements are inadmissible under *Crawford* and [*Davis v. Washington*, 547 U.S. 813, 822, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006)], notwithstanding the provisions of K.S.A. 60-460[dd]"); *cf. State v. Jones*, 287 Kan. 559, 566, 197 P.3d 815 (2008) (*Crawford* left open the possibility of exceptions to a person's constitutional right to confront witnesses).

· The parties do dispute whether the statements are testimonial. *Crawford* did not explicitly define the term "testimonial." *Crawford*, 541 U.S. at 68 ("We leave for another day any effort to spell

out a comprehensive definition of 'testimonial.' "). But the Supreme Court did state that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Crawford*, 541 U.S. at 68; see *Davis*, 547 U.S. at 822 (in context of law enforcement interrogations, statements are nontestimonial when made under circumstances objectively indicating that the primary purpose of the interrogation is to enable law enforcement assistance to meet an ongoing emergency).

*Crawford, Davis,* and the case consolidated with *Davis* for decision, *Hammon v. Indiana,* 547 U.S. 813, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006), dealt with statements made to law enforcement officers soon after a criminal incident. In *Crawford,* Sylvia Crawford was interviewed by law enforcement officers after her husband stabbed a man who had allegedly attempted to rape her; Sylvia was in custody at the time. The Supreme Court concluded Sylvia's statements were testimonial and should not have been admitted in her husband's trial after she asserted her spousal privilege. *Crawford,* 541 U.S. at 65-68. In reaching this holding the *Crawford* Court noted: "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford,* 541 U.S. at 51.

This broad guidance was clarified in *Davis* where the Court explained: "Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the [interrogation's] primary purpose . . . is to enable police assistance to meet an ongoing emergency," but they "are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose is to establish or prove past events potentially relevant to later criminal prosecution." *Davis,* 547 U.S. at 822. Thus, a recording of a 911 call describing an ongoing domestic disturbance was nontestimonial in *Davis,* where the victim's "elicited statements were necessary to be able to *resolve* [the ongoing] emergency," and the statements were not formal. *Davis,* 547 U.S. at 827.

On the other hand, the statements at issue in *Hammon* were testimonial, where the victim was interviewed after the domestic disturbance in a room separate from her assailant and "deliberately recounted, in response to police questioning," the past events. *Davis*, 547 U.S. at 830. Because at the time of the interrogation any emergency had ceased, "[o]bjectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime." *Davis*, 547 U.S. at 830.

Based principally on the decisions in *Crawford*, *Davis*, and *Hammon*, in *Brown*, 285 Kan. 261, this court established four factors to be considered in determining when evidence is testimonial:

"(1) Would an objective witness reasonably believe such a statement would later be available for use in the prosecution of a crime?

"(2) Was the statement made to a law enforcement officer or to another government official?

"(3) Was proof of facts potentially relevant to a later prosecution of a crime the primary purpose of the interview when viewed from an objective totality of the circumstances, including circumstances of whether

(a) the declarant was speaking about events as they were actually happening, instead of describing past events;

(b) the statement was made while the declarant was in immediate danger, *i.e.*, during an ongoing emergency;

(c) the statement was made in order to resolve an emergency or simply to learn what had happened in the past; and

(d) the interview was part of a governmental investigation; and

"(4) Was the level of formality of the statement sufficient to make it inherently testimonial; *e.g.*, was the statement made in response to questions, was the statement recorded, was the declarant removed from third parties, or was the interview conducted in a formal setting such as in a governmental building?" *Brown*, 285 Kan. at 291.

The parties' and the Court of Appeals' analysis is based on *Brown*.

*Court of Appeals' Decision*

The Court of Appeals concluded that several of these factors weighed against a finding that the statements were testimonial. For example, the court concluded there was no indication of any formalities and procedures regularly associated with testimonial hearsay. In addition, there was no evidence that N.A. made the state-

ments in the presence of a law enforcement officer. And, the Court of Appeals dismissed Miller's argument that the SANE, as part of a sexual assault response team, was an agent of the State, concluding there was no evidence she was a law enforcement officer or a government official. *State v. Miller*, 42 Kan. App. 2d 12, 25-27, 208 P.3d 774 (2009).

Nevertheless, according to the Court of Appeals panel, there were circumstances that favored a conclusion that the statements were testimonial. Citing *Henderson*, 284 Kan. 267 (admission of a child victim's videotaped statement to Social and Rehabilitation Services social worker and detective without opportunity for defendant to cross-examine witness violated defendant's constitutional right of confrontation), the panel concluded that, from an objective witness' perspective, the witness could expect the physical evidence collected by a SANE and the witness' statements made to a SANE to be used for the prosecution of a crime. *Miller*, 42 Kan. App. 2d at 27. Additionally, the panel stated it was clear that N.A.'s statements to the SANE described past events and were not made to resolve an emergency. The panel also found it significant that the SANE testified at trial that she asked N.A. what happened because she needed to know where to swab and collect evidence. According to the panel, at no time did the SANE testify that the primary purpose of her examination was for medical diagnosis or treatment. Based on the totality of these circumstances, the panel concluded that the primary purpose of the medical examination was to collect and preserve evidence for later use in the prosecution of a crime, not for medical diagnosis or treatment. *Miller*, 42 Kan. App. 2d at 28.

In summary, the Court of Appeals panel concluded the SANE's "examination was for the sole purpose to collect evidence that would be used against Miller at trial, even though [the SANE] was not a law enforcement officer and her questioning had no apparent formalities usually accompanying a testimonial statement." *Miller*, 42 Kan. App. 2d at 29. According to the Court of Appeals panel, because the statements were testimonial, the trial court violated Miller's confrontation rights when it admitted the statements. *Miller*, 42 Kan. App. 2d at 29.

The Court of Appeals ultimately concluded, however, that the error was harmless based on the overwhelming evidence of Miller's guilt, which included similar statements N.A. made to her mother and grandmother and Miller's signed confession. *Miller*, 42 Kan. App. 2d at 29-30.

*Parties' Arguments on Petition for Review*

Before us, Miller renews his arguments that N.A.'s statements to the SANE are testimonial because: (1) the SANE "could only believe that the statements made by N.A. would be used in the prosecution" of Miller because her job was to provide documentation for later prosecution; (2) the SANE was "acting at the behest of the police and therefore was an agent of the police"; and (3) the facts elicited by the SANE were for the primary purpose of prosecution because they described a past event and were not made during an emergency situation. Miller, naturally, concurs with the Court of Appeals' ruling that N.A.'s statements to the SANE were testimonial; however, he argues the Court of Appeals erred in finding that the erroneous admission of the evidence was harmless. Miller points out that N.A.'s statements were "used substantively during closing arguments." Specifically, the prosecutor emphasized the SANE's testimony as the basis of the aggravated criminal sodomy charge—"[N.A.] indicated to [the SANE] that she was [sexually] assaulted, that during her assault a finger was stuck in her anus, pulled out, and licked."

The State, on the other hand, argues that N.A.'s statements to the SANE were nontestimonial because: (1) no law enforcement officer was present during N.A.'s exam by the SANE; (2) N.A.'s mother made the decision to take N.A. to the hospital at the same time she made the decision to call the police; (3) N.A. was only 4 years old at the time of her statements and would not have believed her statements would later be used in trial; (4) N.A.'s statements to the SANE were made to assist the SANE in the medical examination; and (5) the primary purpose of N.A.'s visit to the hospital was for a medical assessment and treatment. The State also cites many other jurisdictions where the courts have concluded the statements made by a victim during an examination by a sexual

assault nurse or other medical professional were nontestimonial. Finally, the State maintains any error was harmless because N.A.'s mother and grandmother testified to similar statements and because Miller confessed.

## Other Jurisdictions

As the State points out, numerous other states have considered the question of whether statements made by sexual assault victims to medical professionals are testimonial. Our review of the decisions cited by the parties and many other decisions reveals that jurisdictions are divided on this issue. It seems, however, that the majority of jurisdictions have determined that when there is a medical purpose to the examination, the statements are nontestimonial.

### • Nontestimonial Statements

In many of the cases where courts have found the statements by sexual assault victims to be nontestimonial, the statements have been made to emergency room (ER) medical professionals or general medical professionals performing examinations for sexual abuse and gathering information and evidence through a rape kit. See *State v. Slater*, 285 Conn. 162, 185, 939 A.2d 1105 (2008) (adult victim's statement to ER physician and nurse identifying rapist nontestimonial; procedure regarding rape kits should not categorically, nor under specific facts of case, render statements of rape victim, who was transported to hospital by law enforcement officer, testimonial); *Commonwealth v. DeOliveira*, 447 Mass. 56, 64-66, 849 N.E.2d 218 (2006) (child victim's statements of sexual abuse to ER pediatrician nontestimonial even when brought to the hospital by law enforcement officer; officer's presence at hospital does not turn questioning of patient by physician during medical exam into interrogation; reasonable declarant in these circumstances would have understood the question of "what had happened" to be a medical one); *Hobgood v. State*, 926 So. 2d 847, 852 (Miss. 2006) (child victim's statements to physician and psychologist were nontestimonial because they were not working with law enforcement and purpose of statements were to aid medical and psychological treatment, not for furthering the prosecution;

however "[h]ad the police directed the victim to seek treatment from a doctor and a therapist for the purpose of discovering evidence to aid in the investigation then it might be possible for the statements to implicate the Confrontation Clause."); *State v. Vaught*, 268 Neb. 316, 318, 326, 682 N.W.2d 284 (2004) (child victim's statement to ER physician that the defendant "put his finger in her pee-pee" was nontestimonial because the statement was made for the purpose of medical diagnosis or treatment, the victim was taken to the hospital by her family, and "the only evidence regarding the purpose of the medical examination, including the information regarding the cause of the symptoms, was to obtain medical treatment"; there was no indication of a purpose to develop testimony for trial, and there was no indication of governmental involvement); see also *State v. Harper*, 770 N.W.2d 316, 323 (Iowa 2009) (statement of badly burned victim to hospital staff that defendant raped her, tied her, and burned her house were nontestimonial because it bore little resemblance to types of testimonial statements identified in *Crawford* and because primary purpose of statements was to assist physicians in diagnosis and treatment); *Foley v. State*, 914 So. 2d 677, 685 (Miss. 2005) (statements made by child victim to therapists or medical professionals were nontestimonial because "statements were made as a part of neutral medical evaluations" and there was no showing medical professionals contacted law enforcement or were being used by law enforcement to investigate child victim's claims).

In other instances, the statements have been made to medical professionals at centers specializing in sexual assault or to physicians otherwise specializing in sexual abuse. See *People v. Vigil*, 127 P.3d 916, 922-24 (Colo. 2006) (child victim's statements about sexual assault to physician who performed the sexual assault kit were nontestimonial; although physician was member of child protection team, law enforcement officer was not present during examination and objectively reasonable person in position of declarant would have believed that statements were for medical purpose rather than use at later trial); *People v. Garland*, 286 Mich. App. 1, 10-11, 777 N.W.2d 732 (2009) (adult victim's statements to nurse at center for sexual assault survivors were nontestimonial,

despite nurse's collection of evidence, because primary purpose of patient history and examination after sexual assault is for diagnosis and treatment; "although the nurse does collect evidence during the course of the examination after taking a patient's history and the nurse is required to report the sexual assault and turn over the evidence to law enforcement officials, the nurse is not involved in the police officer's interview of the victim after the examination and is not personally involved in the officer's investigation of the crime"); *State v. Krasky*, 736 N.W.2d 636, 641-42 (Minn. 2007) (videotaped statements of child victim to nurse at Midwest Children's Resource Center regarding prior sexual abuse were nontestimonial because primary purpose of the statements was to assess and protect child's health and welfare); *State v. Scacchetti*, 690 N.W.2d 393, 396 (Minn. App. 2005) (admission of 3-year-old victim's statements to physician specializing in diagnosing sexual abuse did not violate defendant's confrontation rights because circumstances did not suggest victim believed statements would be available for use at later trial and physician was not working on behalf of investigating officers or government officials; purpose of exam was diagnosis and treatment); *State v. Stahl*, 111 Ohio St. 3d 186, 198-99, 855 N.E.2d 834 (2006) (statement identifying rapist by deceased victim to nurse specializing in treatment of sexual assault victims was nontestimonial because although law enforcement officer who transported victim to the hospital was present during the examination, statement was made to nurse in the ordinary course of medical examination and not elicited by law enforcement interrogation; while specialized unit gathers evidence for future prosecution, primary purpose is to render medical treatment; and since victim had already given statement to officer, objective witness would believe statement to nurse was for medical treatment purpose); *State v. Castilla*, 131 Wash. App. 7, 87 P.3d 1211, at *13 (2004) (unpublished part of opinion only online) (statements made by victim to sexual assault nurse regarding rape were nontestimonial because not elicited by government official and were not given with an eye toward trial); see also *Seely v. State*, 373 Ark. 141, 154-56, 282 S.W.3d 778 (2008) (child victim's statements to a social worker whose duties included interviewing chil-

dren brought to the hospital for physical or sexual abuse were non-testimonial where the parent brought the victim to hospital, law enforcement did not request or participate in the interview, and the social worker's primary purpose was to assess victim's safety and need for medical treatment).

• *Testimonial Statements*

Other jurisdictions have considered the sexual-assault-nurse-interview scenario and concluded that admission of statements made during such an interview violates the Confrontation Clause because those statements are testimonial in nature. These cases are factually distinguishable from the majority of the cases where courts have found the statements to medical professionals to be nontestimonial in that there is little evidence of a medical purpose to the examination in these testimonial cases. In some of the cases, a significant lapse of time between the assault and the examination was deemed significant. See *Hernandez v. State*, 946 So. 2d 1270, 1280-81 (Fla. Dist. App. 2007) (child victim's statements to a " 'Child Protection Team' " nurse 1 week after sexual attack were testimonial where the forensic examination was conducted at law enforcement's behest, a statute required the nurse to perform medical and forensic examinations and serve as a witness at trial, the primary purpose of the examination was to gather information for potential criminal prosecution, and there was no ongoing emergency; the court noted there was no indication of injuries in the record on appeal); *Hartsfield v. Com.*, 277 S.W.3d 239, 244-45 (Ky. 2009) (rape victim's statements to sexual assault nurse were testimonial because the nurse acted in cooperation with law enforcement and gathered evidence for use at a later prosecution; interview with the nurse was more analogous to a law enforcement interview than a medical examination because the questioning was not for the purpose of resolving a problem or an emergency, but rather to gather evidence of past events to be used in a future criminal prosecution); *Medina v. State*, 122 Nev. 346, 353-55, 143 P.3d 471 (2006) (rape victim's statements to sexual assault nurse, who did "not provide medical treatment," during a sexual assault examination were testimonial because the nurse was "a police operative" in that she was a "fo-

rensics nurse" who, according to her own testimony, gathered "evidence for possible criminal prosecutions" and because the circumstances of the examination "would lead an objective witness to reasonably believe that the statements would be available for use at a later trial"); *State v. Romero*, 141 N.M. 403, 407-08, 156 P.3d 694 (2007) (statements naming the perpetrator made by adult victim during an examination by sexual assault nurse were testimonial as the examination occurred weeks after the assault and with the assistance and encouragement of law enforcement).

In other cases, a medical examination for injuries and treatment has been conducted by general medical professionals and a separate forensic examination has been conducted by a trained sexual assault nurse. See *United States v. Bordeaux*, 400 F.3d 548, 555-56 (8th Cir. 2005) (sexual abuse victim first examined by forensic interviewer and then physician; statements to forensic interviewer were testimonial in nature; the questioning was formal and had purpose of collecting information for law enforcement, even if it had secondary medical purpose); *United States v. Gardinier*, 65 M.J. 60, 65-66 (2007) (sexual assault nurse conducted forensic medical examination a few days after the victim had been treated by other medical professionals; the exam was completed at the behest of law enforcement; the consent form for the examination stated that the form would be provided to law enforcement; under the totality of the circumstances, the victim's "statements were elicited in response to law enforcement inquiry with the primary purpose of producing evidence with an eye toward trial"); *State v. Hooper*, 145 Idaho 139, 145, 176 P.3d 911 (2007) (child victim's statements to a forensic interviewer at Sexual Trauma Abuse Response Center [after physician had first conducted medical examination of the victim] were testimonial where victim was advised that law enforcement officers were watching the interview, the officers determined some of the questions asked, which were designed to prove past events relevant to a later prosecution, the questions covered details not pertinent to medical concerns and the victim was not asked about any injuries, a videotape of the interview and other evidence were turned over to officers, and "the interview was geared toward gathering evidence rather than pro-

viding medical treatment"); *People v. Stechly*, 225 Ill. 2d 246, 251-52, 299-300, 870 N.E.2d 333 (2007) (child victim's statements to a clinical specialist with the hospital's child sexual abuse team were testimonial where victim's mother brought her to the ER, the specialist first interviewed the victim in a playroom and then took the child to the ER for a medical exam, and the specialist conducted a second interview the following day and then contacted law enforcement officers; the primary purpose of both interviews was to gather information for an investigation and possible prosecution and the specialist was a "mandated reporter[]" legally required to report child sexual abuse); *State v. Cannon*, 254 S.W.3d 287, 303-06 (Tenn. 2008) (finding primary purpose was " 'to establish or prove past events potentially relevant to later criminal prosecution' " where ER medical professionals had examined and stabilized the victim before she spoke with a sexual assault nurse; victim's statements to the nurse were testimonial but statements to ER professionals were nontestimonial because primary purpose was medical diagnosis and treatment of injuries sustained in attack).

While it is somewhat difficult to synthesize these cases as their tests for the testimonial/nontestimonial inquiry vary, generally where there is a clear medical purpose to the examination—often evidenced by the treating physician's or nurse's testimony that the question of "what happened" was necessary for treatment of medical issues—the statements are nontestimonial even if there is a secondary purpose of preserving evidence. On the other hand, when there is little to no medical purpose for the examination and the interview is conducted by a sexual assault nurse primarily for forensic purposes, the conclusion is that the victim's statements are testimonial. Further, if a law enforcement officer participates in the questioning, there is a strong trend toward finding the victim's statements testimonial.

*Subsequent Supreme Court Decisions*

What seems consistent in nearly all cases is the courts' use of case-specific analysis of the challenged statements based on the totality of the underlying circumstances to determine the testimonial or nontestimonial nature of the statements. This approach

is consistent with the analysis in the most recent United States Supreme Court decisions, in particular the decision in *Michigan v. Bryant*, 562 U.S. 344, 359, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (emphasizing that analysis begins with the circumstances of the interrogation).

*Bryant* is one of four recent decisions of the United States Supreme Court that post-dates our decision in *Brown* and almost all of the decisions from other jurisdictions regarding statements to medical professionals. Each of these decisions provides some clarification of the factors that might apply to our analysis. These decisions are: *Bullcoming v. New Mexico*, 564 U.S. ___, 131 S. Ct. 2705, 180 L. Ed. 2d 610 (2011); *Bryant*, 562 U.S. 344; *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 129 S. Ct. 2527, 174 L. Ed 2d 314 (2009); and *Giles v. California*, 554 U.S. 353, 128 S. Ct. 2678, 171 L. Ed. 2d 488 (2008). *Bryant* has the most extensive discussion, but the other cases make an important point that will relate to our application of *Bryant* to the facts of Miller's appeal. Specifically, as further discussed, in *Bullcoming*, *Melendez-Diaz*, and *Giles*, the Court indicated that statements made to medical professionals during the course of receiving medical treatment and statements made as part of most business records are nontestimonial.

In the earliest of these cases, *Giles*, the Court noted: "[O]nly *testimonial* statements are excluded by the Confrontation Clause. Statements to friends and neighbors about abuse and intimidation and *statements to physicians in the course of receiving treatment would be excluded*, if at all, only by hearsay rules." (Emphasis added.) *Giles*, 554 U.S. at 376.

*Bullcoming* and *Melendez-Diaz* discussed the nontestimonial nature of most business records, which would include medical records. The Court held there were exceptions to this general rule, however. The specific question in *Melendez-Diaz* was whether the defendant's right to confrontation was violated by the admission of an affidavit of a forensic lab analyst who had tested material seized by law enforcement officers and determined the material was cocaine. In holding the affidavit was testimonial, the Court rejected the argument that the affidavit was nontestimonial because it was

a business record of the laboratory. The Court noted that "[d]ocuments kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status," except "if the regularly conducted business activity is the production of evidence for use at trial." *Melendez-Diaz*, 557 U.S. at 321.

Following the decision in *Melendez-Diaz*, the Court in *Bullcoming* considered whether a blood-alcohol concentration report and an officer's certification of the test results were testimonial. The Court reiterated the general rule that business records are nontestimonial but noted the exception for records produced as evidence for trial. Because of the exception, the Court concluded the analyst who prepared the report and the officer who completed the certification had to be subject to cross-examination because the documents were prepared in anticipation of prosecution. *Bullcoming*, 131 S. Ct. at 2717.

The discussions in *Giles*, *Melendez-Diaz*, and *Bullcoming* suggest a general rule that statements made to health care professionals during the course of treatment and recorded in medical records and statements in other business records would generally not be testimonial because the purpose of such statements is not to produce evidence for use at trial. This point is reiterated in *Bryant*, 562 U.S. 344, which makes numerous points relevant to our inquiry.

In *Bryant*, law enforcement officers responded to a gas station parking lot. A mortally wounded gunshot victim had driven himself to the lot from his home where he had been shot. On questioning by the officers, the victim asked for medical attention and identified his shooter and the location of his shooting. Reviewing the decisions in *Crawford*, *Davis*, and *Hammon*, the Court explained the nature of testimonial statements, stating:

"[T]he most important instances in which the Clause restricts the introduction of out-of-court statements are those in which *state actors* are involved in a *formal*, out-of-court interrogation of a witness to obtain evidence for trial. [Citation omitted.] Even where such an interrogation is conducted with all good faith, introduction of the resulting statements at trial can be unfair to the accused if they are untested by cross-examination. Whether formal or informal, out-of-court statements can evade the basic objective of the Confrontation Clause, which is to prevent the accused from being deprived of the opportunity to cross-examine the

declarant about statements taken for use at trial. When, as in *Davis*, the *primary purpose* of an interrogation is to respond to an *'ongoing emergency,' its purpose is not to create a record for trial and thus is not within the scope of the Clause.* But there may be *other* circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony. *In making the primary purpose determination, standard rules of hearsay, designed to identify some statements as reliable, will be relevant.* Where no such primary purpose exists, the admissibility of a statement is the concern of state and federal rules of evidence, not the Confrontation Clause." (Emphasis added.) *Bryant*, 562 U.S. at 358-59.

Despite the reference to "state actors," the Court, as it had in *Davis*, included a footnote referring to the possibility of statements being testimonial if made to someone other than a law enforcement officer. The *Bryant* Court noted that the *Davis* Court had determined 911 operators " 'may at least be agents of law enforcement when they conduct interrogations of 911 callers,' and therefore 'consider[ed] their acts to be acts of the police' for purposes of the opinion." (Emphasis added.) *Bryant*, 562 U.S. at 357-58 n.3 (quoting *Davis*, 547 U.S. at 823 n.2); see *Bryant*, 562 U.S. at 379 (Scalia, J., dissenting) ("The identity of an interrogator, and the content and tenor of his questions," can illuminate the primary purpose of the interrogation.). Because the victim in *Bryant* had spoken directly to State actors, *i.e.*, law enforcement officers, the *Bryant* Court noted it did not need to further address that issue. *Bryant*, 562 U.S. at 357-58 n.3.

But the circumstances of the case required "additional clarification with regard to what *Davis* meant by 'the primary purpose' of the interrogation is 'to enable police assistance to meet an ongoing emergency.' " *Bryant*, 562 U.S. at 359 (quoting *Davis*, 547 U.S. at 822). As part of this clarification, the *Bryant* Court provided guidance on how to determine the primary purpose of an interrogation, explaining the determination requires "[a]n objective analysis of the circumstances of an encounter and the statements and actions of the parties." *Bryant*, 562 U.S. at 360. Some relevant factors listed by the Court were whether the encounter occurs "at or near the scene of the crime versus at a police station" or "during an ongoing emergency or afterwards." *Bryant*, 562 U.S. at 360. The Court emphasized the circumstances that determine the pri-

mary purpose of an interview "are clearly matters of objective fact." Because the focus is on objective facts, "the relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred." *Bryant*, 562 U.S. at 360.

The most important objective fact, according to the *Bryant* Court, is whether there was an " 'ongoing emergency' " at the time the statements were made to law enforcement officers. If the focus was on an emergency, the Court reasoned, the participants were focused on " 'end[ing] a threatening situation' " rather than " 'prov[ing] past events potentially relevant to later criminal prosecution.' " *Bryant*, 562 U.S. at 361 (quoting *Davis*, 547 U.S. at 822, 832). The *Bryant* Court explained the rationale for the distinction by stating: "Implicit in *Davis* is the idea that because the prospect of fabrication in statements given for the primary purpose of resolving that emergency is presumably significantly diminished, the Confrontation Clause does not require such statements to be subject to the crucible of cross-examination." *Bryant*, 562 U.S. at 361.

The Court reasoned this rule was similar to the recognition of reliability inherent in the excited utterance exception to hearsay. In a footnote, the Court observed there were other hearsay exceptions which "similarly rest on the belief that certain statements are, by their nature, made for a purpose other than use in a prosecution and therefore should not be barred by hearsay prohibitions." *Bryant*, 562 U.S. at 362 n.9. As relevant to Miller's argument in this case, the Court cited the Federal Rule of Evidence 803(4) relating to a hearsay exception for statements made for purposes of medical diagnosis or treatment, and also cited the following authorities:

"*Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 324, 129 S.Ct., at 2539-2540 ('Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial'); *Giles v. California*, 554 U.S., at 376, 128 S.Ct. 2678 (noting in the context of domestic

violence that '[s]tatements to friends and neighbors about abuse and intimidation and statements to physicians in the course of receiving treatment would be excluded, if at all, only by hearsay rules'); *Crawford*, 541 U.S., at 56, 124 S.Ct. 1354 ('Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.')." *Bryant*, 562 U.S. at 362 n.9.

With those general principles stated, the *Bryant* Court turned to the specifics of the "highly context-dependent inquiry" of whether there was an ongoing emergency when officers encountered the shooting victim in the parking lot. One circumstance evaluated by the Court was whether there was a continuing threat. The Court observed that *Davis* and *Hammon* involved domestic abuse situations in which the perpetrator was known and was not likely to be a threat to the general public or law enforcement. *Crawford*, the Court noted, related to a resolved situation; Sylvia Crawford's husband was the alleged aggressor and was under arrest. In contrast, in *Bryant*, it was not known if the perpetrator was a threat to the general public, the victim, the officers, or emergency personnel. See *Bryant*, 562 U.S. 356, 363-64, 371-73.

Another consideration, according to the Court, is the type of weapon used in the commission of the crime. The Court found it significant that a gun had been used in *Bryant* as distinguished from a knife in *Crawford* and fists and hands in *Davis* and *Hammon*. *Bryant*, 562 U.S. at 363-64.

Additionally, the *Bryant* Court determined the Michigan Supreme Court's failure to appreciate the "context-dependant nature of our *Davis* decision" led it to erroneously conclude the medical condition of a declarant is irrelevant. The Court stated: "The medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." *Bryant*, 562 U.S. at 364-65. Applying that conclusion to the facts of the case before it, the *Bryant* Court noted the victim was in pain, was struggling to breathe, and was repeatedly asking when medical personnel would arrive. These circumstances weighed in favor of an objective conclusion that the primary pur-

pose of the statements was not to aid in the future prosecution for the crime. *Bryant*, 562 U.S. at 374.

The *Bryant* Court then noted that while the existence of an ongoing emergency is an important factor in determining the primary purpose of a statement, there are other factors, including the formality of the encounter that must also be considered. The Court stated:

"Formality is not the sole touchstone of our primary purpose inquiry because, although formality suggests the absence of an emergency and therefore an increased likelihood that the purpose of the interrogation is to 'establish or prove past events potentially relevant to later criminal prosecution,' [citation omitted,] informality does not necessarily indicate the presence of an emergency or the lack of testimonial intent. [Citation omitted.]" *Bryant*, 562 U.S. at 366.

The Court noted the circumstances of *Bryant*—statements made in an exposed, public area, prior to the arrival of emergency medical services, and made in a disorganized fashion—distinguished the statements from those made under the formal setting of a stationhouse interrogation as in *Crawford*. *Bryant*, 562 U.S. at 366. The Court did not discuss or distinguish the circumstances of *Hammon*, where the statements were made at the scene of the crime—the home of the victim and her assailant. See *Davis*, 547 U.S. at 819-20.

Next, the *Bryant* Court noted that "[i]n addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation." *Bryant*, 562 U.S. at 367. The Court stated this combined approach ameliorates problems that could arise from looking solely to one participant, specifically the problem of "mixed motives," which both an interrogator and a declarant are likely to have. For example, the desire of the victim to have the threat to her and other potential victims cease "does not necessarily mean that the victim wants or envisions prosecution of the assailant." *Bryant*, 562 U.S. at 368. The Court cautioned the consideration of statements and actions should not transform the inquiry into a subjective evaluation, stating: "The inquiry is still objective because it focuses on the understanding and purpose of a reasonable victim in the circumstances of the

actual victim—circumstances that prominently include the victim's physical state." *Bryant*, 562 U.S. at 369. In this regard the victim's medical condition and the nature of the officer's questions were significant. The Court observed the questions asked by the officers in *Bryant*—"what had happened, who had shot him, and where the shooting occurred,' [citation omitted]"—were the type of questions necessary to allow the officers to assess the danger to themselves, the victim, and the public. *Bryant*, 562 U.S. at 376.

The Court also reiterated a point made in *Davis*: What starts as an emergency may transition to a nonemergency, in which case some statements might be admissible while others are not. The Court explained:

"As we recognized in *Davis*, 'a conversation which begins as an interrogation to determine the need for emergency assistance' can 'evolve into testimonial statements.' [Citation omitted.] This evolution may occur if, for example, a declarant provides police with information that makes clear that what appeared to be an emergency is not or is no longer an emergency or that what appeared to be a public threat is actually a private dispute. It could also occur if a perpetrator is disarmed, surrenders, is apprehended, or, as in *Davis*, flees with little prospect of posing a threat to the public. Trial courts can determine in the first instance when any transition from nontestimonial to testimonial occurs, and exclude 'the portions of any statement that have become testimonial, as they do, for example, with unduly prejudicial portions of otherwise admissible evidence.' " *Bryant*, 562 U.S. at 365-66 (quoting *Davis*, 547 U.S. at 828, 829).

Ultimately, under the particular facts in *Bryant*, the Court concluded the "circumstances of the encounter as well as the statements and actions of [the victim] and the police objectively indicate that the 'primary purpose of the interrogation' was 'to enable police assistance to meet an ongoing emergency.' " *Bryant*, 562 U.S. at 377-78 (quoting *Davis*, 547 U.S. at 822). Consequently, the victim's "identification and description of the shooter and the location of the shooting were not testimonial hearsay," the Court concluded. *Bryant*, 562 U.S. at 378.

*Were N.A.'s Statements to the SANE Testimonial?*

This " 'highly context-dependent inquiry' " conducted by the *Bryant* Court suggests there is validity to the holdings of those courts that have analyzed statements made to medical professionals

in the context in which they were made, rather than with broad, categorical rules. Consequently, with the guidance of the United States Supreme Court in mind, we turn to an objective analysis of the circumstances of N.A.'s encounter with the SANE, considering factors such as whether the SANE was a State actor or agent, whether there was an ongoing emergency, whether the encounter was formal, and whether the statements and actions of both N.A. and the SANE reflect a primary purpose focusing on the later prosecution of a crime.

- *Was the SANE an Agent of the State?*

At the outset, it is important to note there is no evidence in the record that any law enforcement officer was present during the SANE's examination of N.A. The record reflects the reporting officer drove N.A. to the hospital—N.A.'s grandmother testified that "[N.A. and N.A.'s mother] went [to the hospital] in the police car." (This is contrary to the Court of Appeal's statement that N.A.'s mother drove N.A. to the hospital. *State v. Miller*, 42 Kan. App. 2d 12, 27, 208 P.3d 774 [(2009].). However, nothing in the record of the second trial indicates the officer was present during the interview. (The record of the first trial clarifies the officer did not remain at the hospital but returned to the house to secure potential evidence. The reasons the officer left the hospital are potentially relevant to the SANE's intentions but will not be considered here because they were not in the record of the second trial.) Consequently, this case is distinguishable from *State v. Bennington*, 293 Kan. 503, 264 P.3d 440 (2011), where the presence of and questioning by a law enforcement officer during a victim's statements is a determinative circumstance which led to the conclusion the statements of the victim to a SANE were testimonial.

In this case, however, there is no indication in the record that any other State actor was present during the interview of N.A. The SANE identified her employer as the hospital where N.A. was seen in the emergency room, but there is nothing in the record to inform us if the hospital is governmental or private. Our inability to make this determination may not be important, however, because of two potentially conflicting considerations. On the one hand, statements

made for the sole purpose of medical treatment, regardless of the employer of the medical professional to whom the statements are made, are not testimonial. See *Bryant*, 562 U.S. at 362 n.9. On the other hand, a consideration for determining if the statements are for medical diagnosis and treatment or for use in criminal prosecution is whether the interrogator is an agent of law enforcement charged with gathering information for purposes of trial. *Bryant*, 562 U.S. at 357-58 n.3; *Davis*, 547 U.S. at 823 n.2; see *State v. Brown*, 285 Kan. 261, 292, 173 P.3d 612 (2007); *State v. Henderson*, 284 Kan. 267, 289, 160 P.3d 776 (2007) (SRS employee considered an agent of law enforcement).

The polarity of these circumstances underscores the difficulty of the analysis in this and similar cases involving sexual assault nurses: There can be two purposes in the interrogation, one for medical diagnosis and treatment and the second for collecting evidence for use in a later future criminal prosecution. In this regard, the *Bryant* court's point regarding the transition from one purpose to another is important. The Court noted:

"[T]he evolutionary potential of a situation in criminal law is not unique to the Confrontation Clause context. We noted in *Davis* that '[j]ust as, for Fifth Amendment purposes, "police officers can and will distinguish almost instinctively between questions necessary to secure their own safety or the safety of the public and questions designed solely to elicit testimonial evidence from a suspect", . . . trial courts will recognize the point at which, for Sixth Amendment purposes, statements in response to interrogations become testimonial.' 547 U.S., at 829, 126 S.Ct. 2266 (quoting *New York v. Quarles*, 467 U.S., at 658-659, 104 S.Ct. 2626)." *Bryant*, 562 U.S. at 1160 n.10.

Under the circumstances of this case, one could conclude the SANE's inquiries transitioned from those made as a medical professional for medical diagnosis and treatment to those made by an agent of the State for the purpose of providing evidence for use in a later prosecution. As a result, this court (and trial courts in future cases) must analyze which statements were made in response to questions posed for each purpose. Often this will require examination of individual questions and responses. This concept was recognized by the New Mexico Supreme Court in *State v. Mendez*, 148 N.M. 761, 242 P.3d 328 (2010), where the court rejected the

notion that a victim's statements made to a sexual assault nurse should be categorically excluded based on the nurse's status. *Mendez*, 148 N.M. at 774. The *Mendez* court indicated that New Mexico courts must "shoulder the heavy responsibility of sifting through statements, piece-by-piece, making individual decisions on each one." *Mendez*, 148 N.M. at 774; see *Mendez*, 148 N.M. at 773 ("[A]ny medical provider who treats sexual abuse victims is engaged to some extent in the collection of evidence, and most understand that the evidence they collect—physical or otherwise—could be used in a subsequent prosecution."); see also *United States v. Gonzolez*, 533 F.3d 1057, 1062 (9th Cir. 2008) (Registered nurse and sexual examiner "was collecting evidence, but that forensic function did not obliterate her role as a nurse, in a hospital, performing a medical examination of a victim of sexual assault. It would have been unprofessional for [the nurse] to have treated [the victim] without eliciting an account of what had happened to her.").

When and where this transition occurs will differ from case to case. In Kansas, one circumstance that may weigh in the determination is the nature of a witness' consent. Another is whether the medical professional is following the protocols established for the collection of evidence. K.S.A. 2010 Supp. 65-448 explains both circumstances and distinguishes an examination that occurs at the request of law enforcement with the victim's written consent for evidence to be submitted to law enforcement from an examination performed when the patient requests the information not be shared with law enforcement. The statute states, in part:

"(a) *Upon the request of any law enforcement officer and with the written consent* of the reported victim, or upon the request of the victim, any physician, a licensed physician assistant, who has been specially trained in performing sexual assault evidence collection, or a registered professional nurse, who has been specially trained in performing sexual assault evidence collection, on call or on duty at a medical care facility of this state, as defined by subsection (h) of K.S.A. 65-425, and amendments thereto, shall examine persons who may be victims of sexual offenses . . . using Kansas bureau of investigation sexual assault evidence collection kits or similar kits approved by the Kansas bureau of investigation, for the purposes of gathering evidence of any such crime. If an examination has taken *place solely upon the request of the victim, the medical care facility shall not notify any law*

*enforcement agency without the written consent* of the victim, unless otherwise required by law. . . . The department of health and environment, in cooperation with the Kansas bureau of investigation, shall establish procedures for gathering evidence pursuant to this section." (Emphasis added.) K.S.A. 2010 Supp. 65-448(a).

In this case, the record does not establish whether a law enforcement officer requested the examination or whether N.A.'s mother was asked to consent to the release of the information to law enforcement.

Nevertheless, the SANE testified to other circumstances that suggest evidence collection was at least one role of obtaining N.A.'s statement. For example, the SANE indicated she completed a special course and gained experience with other members of the response team, which includes law enforcement, in order to become a SANE. The SANE also testified the job of a SANE is to "work with victims . . . of sexual assault who come to us and . . . we do head-to-toe examination after we ask them what's happened so that we know what areas on their body to look for things [and] we collect evidence." Further, some of the admitted exhibits are forms printed with a notation identifying them as part of the KBI sexual assault evidence collection kit.

We conclude the SANE was acting as an agent of law enforcement when performing the role of collecting evidence and completing the KBI evidence kit. Any inquiries made solely for the purpose of recording answers on a KBI form would produce testimonial statements in most circumstances. However, inquiries made for the sole purpose of medical treatment, or even for a dual purpose that includes treatment, may produce nontestimonial statements, depending on other circumstances.

As compared to *Bennington,* 293 Kan. at 518-24, where the record clearly established which statements were in response to the KBI questionnaire, we do not have a clear record in this case. Nevertheless, objectively, patients expect an inquiry at the beginning of any examination along the lines of "tell me what brings you here," "what is your complaint," or "what happened," which is the type of inquiry at issue here.

• *Was There An Emergency?*

Another factor mentioned in *Bryant* is whether the statement was made to resolve an emergency. Here, there is no indication there was either a law enforcement, medical, or other emergency. The reporting officer had interviewed the family members and gained information about the crime, and there was nothing indicating an immediate threat to N.A., law enforcement, the public, or others. Regarding whether there was a medical emergency, N.A.'s mother testified that before she spoke to law enforcement, she had decided to seek medical treatment for N.A. Nevertheless, she called law enforcement before she sought treatment. The SANE's testimony established she did not see N.A. until about an hour after N.A. was brought to the hospital. These circumstances do not suggest a medical emergency.

Nevertheless, while the existence of an emergency may be an important consideration when determining if questions asked by law enforcement are for gathering information to deal with an emergency rather than for future prosecution of a crime, the existence of an emergency has less relevance when determining whether statements are made to a medical professional for diagnosis and treatment versus criminal prosecution. Granted, if statements are made in a medical emergency, there would be a strong indication the objective purpose was medical diagnosis and treatment. On the other hand, where there are injuries or concerns of injury, the lack of a medical emergency does not negate the purpose of seeking medical treatment. But where injury is not suspected and medical treatment would not be anticipated, there is a strong indication the statements are made for the purpose of prosecution.

• *What Was the Level of Formality?*

*Bryant* also considered the level of formality associated with the encounter. Here, N.A.'s statements were given in a more formal environment than in *Bryant*. Nevertheless, the circumstances that make this interrogation more formal are those that also lend credence to the medical purpose—the taking and recording of a med-

ical history before treatment. Consequently, under the circumstances of this case, the level of formality is not determinative.

• *What Was the Primary Purpose of N.A.'s and the SANE's Words and Actions?*

Next, we consider the objective purpose of the SANE's questions and N.A.'s statements as discerned from their actions and those of N.A.'s mother.

Clearly, N.A.'s mother, and to the extent she would have developed an intent, N.A., had a purpose of seeking medical treatment. (As to the relevance of N.A.'s intent, see *Henderson*, 284 Kan. at 281 ["A young victim's awareness, or lack thereof, that her statement would be used to prosecute, is not dispositive of whether her statement is testimonial. Rather, it is but one factor to consider in light of *Davis'* guidance after *Crawford.*"]). As to N.A.'s actions, she complained of discomfort that was sufficient for her to report it to her mother.

In considering the mother's actions, as the person who would have consented to N.A.'s medical treatment, objectively a parent of a small child who reported rape and sodomy would be concerned and would want a physical examination to determine if treatment was necessary, especially if, as in this instance, the child reported she was "hurting down in her vagina." It is also significant that the reporting officer had already conducted interviews. Under those circumstances, objectively the person consenting to and providing information to a health care professional would consider the purpose of statements to be to assist in medical diagnosis and treatment. N.A.'s mother may have understood there would be collection of physical evidence, but it is unlikely she would have understood that any statements N.A. made to the SANE were primarily for criminal prosecution.

Objectively, we conclude N.A.'s and her mother's purpose in answering the SANE's questions was to direct the SANE to N.A.'s injuries, not to provide evidence for the prosecution of Miller.

As for the SANE's part, she never indicated in her testimony that her purpose in asking questions was to gather information for medical diagnosis or treatment. Rather, according to her, she gath-

ered information about the incident because she likes to "know where on the body I need to collect evidence which is part of our job as the Sexual Assault Nurse Examiner, we do swabs, things like that, take pictures, I like to know on the body where I need to be looking for those things." During cross-examination, the SANE testified that part of her role is to collect evidence and turn over to law enforcement what is "included in the sexual assault collection kit." In addition, the SANE testified that after N.A. described the attack which caused her vaginal and anal tears, she took a few swabs from the forearm, the arm, the coccyx area, the labia majora, looked at N.A.'s genital area, and complied with the KBI evidence kit, which requires the collection of fingernail scrapings and "things like that."

Yet, as explained in *Bryant*, the relevant inquiry in determining the primary purpose of an interrogation is not the subjective or actual purpose of the individuals involved; a court objectively examines what reasonable participants—both interrogator and declarant—would have viewed as the purpose. See *Bryant*, 562 U.S. at 360, 366. Without the benefit of *Bryant*, the Court of Appeals placed a great deal of emphasis on the SANE's purpose and gave little to no attention to the mother's and N.A.'s actions and statements.

Objectively, there is evidence in the record, beyond the SANE's testimony, that suggests a medical purpose to the examination. As noted above, there is clear evidence that N.A. complained of pain, both N.A.'s mother and grandmother witnessed irritation in N.A.'s genital area, and N.A.'s mother intended to take N.A. to a medical professional. The record clearly establishes that N.A. suffered injuries from the attack—multiple lacerations and abrasions to her vagina and anus—and that she received medical assessment and treatment for her injuries. The SANE also testified that she saw N.A. 1 week after the initial exam for a follow-up exam. Again, the record suggests a dual purpose for the second examination: (1) documentation of any bruising and (2) to assure there was appropriate healing.

The SANE documented N.A.'s description of what happened in the medical record. This raises the State's argument that the state-

ments have to be considered nontestimonial because they are preserved in the business record. Because of the dual purpose of the examination, we reject a conclusion that the statements are categorically nontestimonial because they were recorded in a business record. Clearly, the recording of answers on the KBI evidence kit questionnaire would be for production of evidence for purposes of prosecution. On the other hand, the completion of standard medical records used in a medical setting may not be for purposes of prosecution, depending on other circumstances. See *Melendez-Diaz*, 557 U.S. at 321 (business records may be testimonial "if the regularly conducted business activity is the production of evidence for use at trial"); see also *Bryant*, 562 U.S. at 362 n.9 (same).

*Conclusion*

An objective evaluation of the totality of the circumstances leads us to the conclusion that N.A.'s statements in response to the SANE's inquiry about what happened were nontestimononial. These circumstances include N.A.'s age, her complaint that she was "hurting," the mother's decision to seek medical treatment independent of any request to do so by law enforcement officers, the SANE's action of asking various questions common to all medical examinations, and the SANE's action of providing some medical treatment.

## CUMULATIVE ERROR

Miller argues that cumulative error deprived him of a fair trial. The State responds that no error occurred; but if there were errors, their accumulation was harmless. The cumulative-error doctrine does not apply if there is no error or if only one error supports reversal. *State v. Dixon*, 289 Kan. 46, 71, 209 P.3d 675 (2009). Because we have not found error, this issue lacks merit.

## *JOHNSON* ISSUE

Miller claims the trial court violated his rights guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution by sentencing him to the aggravated term in the appropriate sentencing grid block for his rape conviction without submitting the aggravating factors to a jury for proof beyond a reasonable

doubt. He relies on *Cunningham v. California*, 549 U.S. 270, 127 S. Ct. 856, 166 L. Ed. 2d 856 (2007), and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000).

Because Miller received a presumptive sentence for his rape conviction, we are without jurisdiction to consider this issue. See K.S.A. 21-4721(c)(1); *State v. Johnson*, 286 Kan. 824, 851, 190 P.3d 207 (2008) ("K.S.A. 21-4704[e][1] grants a judge discretion to sentence a criminal defendant to any term within the presumptive grid block, as determined by the conviction and the defendant's criminal history."); see also *State v. Huerta*, 291 Kan. 831, Syl. ¶ 3, 247 P.3d 1043 (2011) (reaffirming that appellate court does not review on direct appeal claims that defendant's presumptive sentence has a constitutionally based infirmity).

### IVORY ISSUE

Finally, Miller contends the use of his criminal history for sentencing purposes, without putting it to a jury and proving it beyond a reasonable doubt, increased the maximum possible penalty for his offense in violation of *Apprendi*, 530 U.S. at 466. This issue has already been decided adversely to Miller and is without merit. See *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 (2002); see also *State v. Foster*, 290 Kan. 696, 699, 233 P.3d 265 (2010) (reaffirming *Ivory*); *State v. Bonner*, 290 Kan. 290, 305, 227 P.3d 1 (2010) (same).

Affirmed.

MORITZ, J., not participating.
DANIEL A. DUNCAN, District Judge, assigned.